* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence, affirms in part and modifies in part the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the named Employee and named Employer.
3. The Carrier liable on the risk is Hartford Casualty Company.
4. The Employee's average weekly wage will be determined from an Industrial Commission Form 22 wage chart.
5. On September 3, 1996, Plaintiff sustained an injury by accident arising out of and in the course of her employment with Defendant-Employer.
6. Medical records from Dr. J. Nicholas Fax were stipulated into the record.
7. The Pre-Trial Agreement dated September 14, 2004, is incorporated by reference.
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was sixty-six years old on the date of this hearing before the Deputy Commissioner, was employed by Defendant-Employer for approximately twelve years. She was initially hired as a grade inspector and worked in this position for six years before accepting a position as a stroke sander. In September 1996, her job duties as a stroke sander with Defendant-Employer included turning around and lifting an assembly that went on the back of a desk, from a pallet board, placing it on her work table, using a stroke sander to sand it and then turning and placing the assembly down on a pallet board. She repeated this process throughout her shift. The assemblies weighed thirty-five to fifty pounds each.
2. On September 3, 1996, Plaintiff sustained an injury due to a specific traumatic incident when she turned to place a sanded assembly onto a pallet board and experienced sudden pain in her low back, hip and left leg. She reported her injury to the secretary and her supervisor and filled out an incident report, but then returned to work. This claim was accepted as compensable and medical compensation was paid through April 4, 1997. As a result of her injury, Plaintiff was restricted initially to no lifting and thereafter to light-duty work, but she did not miss any time from work from September 3, 1996 to April 4, 1997, when she was released to full-duty work.
3. As a result of her injury, Defendant-Employer sent Plaintiff to the company doctor, Dr. Essam S. Eskander, with Chadbourne Family Practice, for treatment after she continued to complain about pain in her back and left hip. On October 15, 1996, Plaintiff presented to Dr. Eskander with complaints of pain in her left hip and pelvic whenever she lifted or pulled something. Dr. Eskander diagnosed her with left flank and left abdominal pain, prescribed medication, and issued restrictions to avoid lifting for two weeks. Plaintiff testified that Defendant-Employer thereafter assigned a helper to assist with her lifting duties.
4. Plaintiff returned to Dr. Eskander on October 31, 1996, with complaints of pain in her left hip, pelvic and lower back. Dr. Eskander noted that Plaintiff was tender in her lower flank and left inguinal area. He then referred Plaintiff to General Surgeon Donald M. Walters, M.D. of Walters Surgical Associates to rule out a hernia.
5. Plaintiff again returned to Dr. Eskander on November 14, 1996, with complaints of pain in her left hip and pelvic. Dr. Eskander noted that Plaintiff was taking Darvocet for her pain and again referred her to Dr. Walters and Defendant-Carrier scheduled an appointment for January 7, 1997. Dr. Eskander's notes state that the "insurance company states she is not covered for this condition."
6. Defendant-Carrier referred Plaintiff to Dr. J. Nicholas Fax, an orthopedic surgeon with Coastal Pain Orthopaedic, for an independent medical examination (IME). When Dr. Fax examined Plaintiff on December 19, 1996, she complained of having pain in her low back, sacroiliac area and left groin area, but not in her leg. Dr. Fax noted that Plaintiff was uncomfortable and hopped around a lot, but was still attempting to perform her job.
7. Dr. Fax ordered a series of x-rays, which revealed a small, soft tissue mass in her left groin that he thought might be causing the groin pain. Dr. Fax referred Plaintiff to Dr. Walters to be checked for an inguinal hernia. If the surgical evaluation did not indicate a hernia, Dr. Fax recommended that an MRI and bone scan be performed in order to determine if Plaintiff had an early stress fracture, since she had evidence of osteoporosis on her x-rays.
8. Dr. Fax initially diagnosed Plaintiff with a strained back and restricted Plaintiff to light-duty work. Dr. Fax sent a copy of his report and diagnosis to Registered Nurse Cindy Malito, who worked for Defendant-Carrier. Defendant-Carrier authorized Dr. Fax to be Plaintiff's treating physician on December 27, 1996. There is no evidence indicating that Plaintiff either consented or objected to the doctor, who performed an IME at Defendant's request, becoming her treating physician.
9. On December 30, 1996, Plaintiff was notified that a nurse case manager was assigned to her claim. She also received a letter directing her to take her prescriptions to REVCO drug store for processing.
10. Dr. Walters evaluated Plaintiff on January 7, 1997. He did not find a hernia, but noted tenderness at the left pubis where it joins the inguinal ligament. He referred Plaintiff to Dr. Zolzer for a colonoscopy.
11. On January 15, 1997, Plaintiff saw Dr. Shobha Farias, an internist, for evaluation. Dr. Farias diagnosed Plaintiff with severe arthralgia in her left hip and tenderness in the left groin. Dr. Farias did not write Plaintiff out of work at this time. Dr. Farias prescribed medication and recommended further follow-up treatment with Dr. Fax.
12. Plaintiff returned to Dr. Fax on January 16, 1997. She reported some improvement at that time, but continued to complain of pain and problems performing her job, including needing assistance with loading and unloading the machine at work. Dr. Fax diagnosed Plaintiff with sciatic-type symptoms and continued her on light-duty restrictions and requested that she return in six weeks.
13. At the office visit with Dr. Fax on February 28, 1997, Plaintiff reported that her symptoms had worsened and she was experiencing more problems with her back and left leg. She described the pain as going all the way down her left leg and reported she had problems bending forward. After examining Plaintiff, Dr. Fax suspected a herniated disk and ordered an MRI. He continued Plaintiff on light-duty restrictions. In March 1997, Plaintiff's MRI revealed normal results.
14. Dr. Fax examined Plaintiff again on March 14, 1997. At that time, Plaintiff continued to complain of pain in her left sacroiliac area. Dr. Fax diagnosed Plaintiff with chronic low back pain, referred her to physical therapy at Total Health and Rehab Services of Whiteville, North Carolina, three times a week for three weeks and recommended that Plaintiff continue to work on light duty.
15. On April 1, 1997, Nurse Malito, the medical rehabilitation professional that Defendant-Carrier assigned to Plaintiff's case, filed a quarterly progress report stating that Plaintiff had a current diagnosis of chronic low back strain and was undergoing physical therapy.
16. Plaintiff returned to Dr. Fax on April 4, 1997. At that time, Dr. Fax felt that her complaints were out of proportion to his physical findings. He noted that she complained "mightily" of pain. Dr. Fax indicated in his medical notes that Plaintiff had been performing her regular job duties and that she had reached maximum medical improvement. Based on his belief that Plaintiff's complaints of pain were exaggerated, the normal MRI, and the absence of relevant neurological findings, Dr. Fax released Plaintiff to return to full-duty work with no permanent partial impairment rating on April 4, 1997. Plaintiff continued to receive physical therapy. On April 14, 1997, Plaintiff reported increased pain in her left hip area and was unable to perform exercises on that day. The physical therapy note from the same date indicates that they would continue to see Plaintiff three times per week.
17. From September 3, 1996 through April 4, 1997, Plaintiff continued to work as a stroke sander for Defendant-Employer, but was given a helper to assist with the lifting. Plaintiff's treating physicians kept her on light-duty restrictions until April 4, 1997, when Dr. Fax released her to work without restrictions and without a permanent partial impairment rating. After April 4, 1997, Plaintiff continued working with Defendant-Employer until May 5, 1997. She testified that she continued to have someone helping her with lifting at work after April 4, 1997.
18. On May 5, 1997, while performing her sanding duties, Plaintiff testified that she suddenly developed such severe left hip and leg pain that she "fell out" and was taken to Columbus County Hospital where she was given two shots, prescribed medication, had x-rays done and was taken out of work for two days. On May 6, 1997, she saw Dr. Farias and complained of numbness and tingling, with pains shooting from her left hip into the left leg. Dr. Farias noted that Plaintiff was tender in the lower back and in the lumbosacral spine as well as the left hip. Dr. Farias diagnosed Plaintiff with having a lumbosacral strain, possible degenerative disc disease, left hip pain and inability to ambulate. Dr. Farias prescribed medication, recommended that Plaintiff see an orthopedic surgeon, wrote her out of work for ten days and referred her to Dr. Charles Haworth, a neurosurgeon.
19. Plaintiff saw Dr. Haworth on May 30, 1997. At that visit, a CT scan and EMG of the left leg were ordered. These test were performed and Plaintiff returned to Dr. Haworth on June 16, 1997. The CT scan showed normal results. Although the EMG showed signs of possible peripheral neuropathy, Dr. Haworth noted that the neurologist had concluded that the tibial and peroneal nerves were within normal limits, and recommended further clinical correlation. Dr. Haworth informed Plaintiff that he could not explain her pain and symptoms, and that he believed she was capable of performing regular-duty work. Plaintiff did not attempt to return to work. She testified that she did not return to work for Defendant-Employer because she was in too much pain
20. Plaintiff did not receive medical treatment due to financial constraints for several months thereafter.
21. Upon referral from Dr. Karen Smith, who diagnosed Plaintiff with left hip sciatica, Plaintiff saw Dr. Malcolm Shupeck, a neurosurgeon with Pinehurst Surgical Clinic, on September 29, 1997. She told Dr. Shupeck about her injury at work and complained that she had been having pain in her left buttock since September 3, 1996, which had worsened over the past six months, and that she had numbness in the back of her leg. Dr. Shupeck performed a neurological examination that was normal, except for a positive straight leg-raising test on the right, which was not the symptomatic side. Dr. Shupeck ordered additional tests, including a myelogram, but the tests did not reveal a structural abnormality that would explain Plaintiff's symptoms.
22. Dr. Shupeck examined Plaintiff again on October 28, 1997, and found she had a positive straight leg-raising test on the left. He ordered an epidural steroid injection to be administrated for diagnostic and therapeutic purposes. Plaintiff reported having some relief due to the injection.
23. Dr. Shupeck saw Plaintiff on November 18, 1997, and found she had a negative straight leg-raising test. He ordered neurological tests, which also failed to show a specific problem.
24. Although Plaintiff continued to complain of back and leg pain, Dr. Shupeck was unable to identify a structural abnormality to explain her complaints. Dr. Shupeck last saw Plaintiff on February 17, 1998, and advised that he had no neurosurgical treatment to offer, but could refer her to a pain clinic for further care. Due to financial constraints, Plaintiff was unable to obtain treatment from a pain clinic.
25. Dr. Shupeck completed a medical form for Heritage Life Insurance Company for Plaintiff indicating that Plaintiff was unable to work from January 8, 1998 through February 17, 1998. However, he would not give an opinion on Plaintiff's ability to work during his deposition testimony.
26. Plaintiff returned to Dr. Farias in June 1998, for treatment for persistent back, left hip and leg pain. Dr. Farias noted that Plaintiff was unable to ambulate, except for short periods of time. She informed Plaintiff to follow-up with Dr. Shupeck. Dr. Farias testified that she did not make any notations in her medical records regarding Plaintiff's ability to work at that time, as it was her understanding that Plaintiff was not working. Dr. Farias opined that she did not think Plaintiff was able to work if she was hurting all the time and not able to ambulate.
27. Dr. Farias saw Plaintiff again on September 29, 1998. At that time, Plaintiff complained of hip and back pain. Dr. Farias recommended that Plaintiff be examined by a pain management specialist. Plaintiff returned to Dr. Farias in December 1998, and February 1999, with continuing pain symptoms in her back, hip and leg. On April 8, 1999, Dr. Farias wrote a letter stating that Plaintiff was unable to pursue gainful employment at that time.
28. By August 15, 1999, Plaintiff was reporting pain in her cervical spine for which she underwent another MRI, which also showed normal findings. Dr. Farias ordered a left lower extremity venous ultrasound, which was performed on October 18, 1999. The ultrasound was normal, with no evidence of deep vein thrombosis.
29. Dr. Farias last treated Plaintiff on March 9, 2000. On that date, Plaintiff continued to complain of severe pain in her hip and low back, which had recently been aggravated by riding in a car to Wilmington, North Carolina. Dr. Farias treated her symptoms. Dr. Farias testified that at the time when she last treated Plaintiff, she was unable to work.
30. Plaintiff sought treatment with Webster Chiropractic Wellness Center in October 2000. Dr. Webster diagnosed Plaintiff with vertebral sublaxation complex including, but not limited to, joint, nerve and muscle damage, inflammation and swelling, and pain. Dr. Webster recommended spinal adjustments and physical therapy to correct Plaintiff's condition.
31. The Full Commission finds credible Plaintiff's testimony that she experienced severe left hip and leg pain while performing her job duties on May 5, 1997. Plaintiff had consistently complained of back, hip and leg pain at every visit to the doctor or physical therapist after her September 3, 1996 injury, but she continued to work. On April 4, 1997, Plaintiff complained "mightily" of pain to Dr. Fax. Although Dr. Fax believed her complaints were exaggerated, he did state that Plaintiff was not pain-free. Plaintiff continued to complain of pain in the same areas that she injured on September 3, 1996, after Dr. Fax released her to regular duty work on April 4, 1997.
32. Based on the greater weight of the evidence, the Full Commission finds that Plaintiff's May 5, 1997 pain symptoms were a continuation of, and flowed directly from her compensable injury of September 3, 1996, which had not completely resolved even though she was released to return to work without restrictions. As a result of the May 5, 1997 flare-up of Plaintiff's pain symptoms, the Emergency Room physician took her out of work for two days and Dr. Farias took her out of work for ten days. Dr. Farias also referred Plaintiff to Dr. Haworth who provided further treatment and testing to try to determine the cause of her pain. Plaintiff remained disabled from work until Dr. Haworth released her to return to work on June 16, 1997.
33. The medical evidence does not establish that Plaintiff's compensable injury of September 3, 1996 caused her to be disabled from work after June 16, 1997. Dr. Shupeck and Dr. Farias were the only doctors who provided expert medical testimony in this case. Dr. Shupeck testified that since he had no anatomical diagnosis for Plaintiff's complaints; he did not have an opinion on whether Plaintiff had any permanent partial impairment; he did not have a theory on what the source of Plaintiff's pain was so he could not say what the cause may have been; he had no reason to disbelieve Plaintiff's pain complaints and he had no notations in his file indicating that he took Plaintiff out of work. He further testified that the Heritage Life Insurance disability form was probably signed at Plaintiff's request at a time when Plaintiff was already documented as being out of work. Dr. Farias was of the opinion that during much of the period she treated Plaintiff, she was incapable of working due to pain. Dr. Farias was not asked and did not give an opinion on whether Plaintiff's disabling pain was causally related to her September 3, 1996 injury.
34. Plaintiff's average weekly wage was $346.40, with a resulting compensation rate of $230.94.
35. The medical treatment Plaintiff received for her compensable injury through June 16, 1997, was causally related to her workplace injury and was reasonably required to effect a cure, provide relief and lessen her disability. The evidence does not establish that the medical treatment Plaintiff received after June 16, 1997, when Dr. Haworth released her to return to work, was causally related to her September 3, 1996 injury.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury arising out of and in the course of her employment with Defendant-Employer on September 3, 1996 as a direct result of a specific traumatic incident of the work assigned. N.C. Gen. Stat. § 97-2(6).
2. This claim was accepted as compensable and medical compensation was paid through April 4, 1997. Plaintiff did not miss any time from work until May 5, 1997. N.C. Gen. Stat. § 97-2(19).
3. The evidence establishes that the severe increase in pain that caused Plaintiff to seek medical treatment and which disabled her from work beginning May 5, 1997, was a continuation of, and a direct and natural consequence of her September 3, 1996 injury. Davis v. Harrah'sCherokee Casino, ___ N.C. App. ___, ___ S.E.2d ___, 2006 WL 2128970
(August 1, 2006).
4. In order to receive disability compensation, the employee has the burden of proving the existence of that disability and its extent.Perkins v. U.S. Airways, ___ N.C. App. ___, 628 S.E.2d 402 (2006). The burden may be met in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment[;] or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury. Russell v. LowesProduct Distribution, 108 N.C. App. 762, 765, 425 S.E.2d 454, 457
(1993). In the instant case, Plaintiff has presented sufficient evidence that on May 5, 1997, while performing her sanding duties, she suddenly developed such severe left hip and leg pain that she "fell out" and had to be taken to the hospital where she was treated and taken out of work for two days. On May 6, 1997, she saw Dr. Farias, who diagnosed her as having a lumbosacral strain, prescribed medication, recommended that she see an orthopedic surgeon and kept her out of work for ten additional days. As a result of Plaintiff's flare-up of pain, she was disabled from May 5, 1997 through June 16, 1997, when Dr. Haworth was unable to determine an objective cause for her pain complaints and released her to return to work. Thereafter, Plaintiff made no efforts to return to work or to find suitable employment.
5. There is insufficient medical evidence to prove that Plaintiff's pain caused her to be disabled from work after June 16, 1997. Dr. Shupeck and Dr. Farias did not causally relate Plaintiff's pain complaints to her September 3, 1996 injury. Holley v. ACTS, Inc., 357 N.C. 228, 581 S.E.2d 750 (2003).
6. Plaintiff's average weekly wage was $346.40, with a resulting compensation rate of $230.94. N.C. Gen. Stat. § 97-2(5).
7. As a result of her compensable injury, Plaintiff is entitled to temporary total disability compensation at the rate of $230.94 per week for the period from May 5, 1997 through June 16, 1997. Plaintiff is not entitled to permanent partial disability since she did not prove that she sustained any permanent impairment due to her September 3, 1996 injury at work. N.C. Gen. Stat. §§ 97-29; 97-31.
8. Plaintiff is entitled to have Defendants provide medical compensation for the treatment she received up to June 16, 1997. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 A W A R D
1. Subject to a reasonable attorney's fee herein approved, Defendants shall pay temporary total disability compensation to Plaintiff at the rate of $230.94 per week for the period from May 5, 1997 through June 16, 1997. As said compensation has accrued, it shall be paid in a lump sum.
2. A reasonable attorney's fee of 25% of the compensation awarded to Plaintiff herein is hereby approved to be deducted from sums due Plaintiff and paid directly to Plaintiff's counsel.
3. Defendants shall pay medical expenses incurred by Plaintiff related to the compensable injury up to June 16, 1997, when bills for the same have been approved in accordance with the provisions of the Act.
4. Defendants shall pay the costs.
This the 21st day of August 2006.
 S/______________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ BUCK LATTIMORE CHAIRMAN
 S/_______________ THOMAS J. BOLCH COMMISSIONER